**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**


Ann M. Sommers,                                    :                    Case No. 3:12 CV 213

                                                   :

      Plaintiff,                              :

                                                   :

v.                                                 :

                                                   :

Commissioner of Social Security,                   :                    **MEMORANDUM**

      Defendant,                              :                    **AND ORDER**

## I. INTRODUCTION

Plaintiff Ann M. Sommers ("Plaintiff") seeks judicial review, pursuant to 42 U.S.C. § 405(g) of

Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying her claim

for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II

and XVI, respectively, of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 (Docket No. 1).

Pending are the parties' Briefs on the Merits (Docket Nos. 10 and 11) and Plaintiff's Reply (Docket

No. 12).[1] For the reasons that follow, the decision of the Commissioner is affirmed.

---

[1]Plaintiff actually seeks summary judgment in her favor (Docket No. 10). However, under the UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF OHIO LOCAL CIVIL RULES 72.2, the Motion for Summary Judgment is considered a petition for review of administrative decision.  The Magistrate Judge does not analyze this case under the summary judgment standard.

## II. PROCEDURAL BACKGROUND

On January 13, 2010, Plaintiff filed an application for a period of DIB under Title II of the

Social Security Act, 42 U.S.C. §§ 416(i) and 423 (Docket No. 6, pp. 161-62 of 715). On that same day,

Plaintiff filed an application for SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381

(Docket No. 6, pp. 157-60 of 715). In both applications, Plaintiff alleged a period of disability

beginning February 13, 2008 (Docket No. 6, pp. 157, 161 of 715). Plaintiff's claims were denied

initially on April 26, 2010 (Docket No. 6, pp. 84, 88 of 715), and upon reconsideration on August 19,

2010 (Docket No. 6, pp. 93, 100 of 715). Plaintiff thereafter filed a timely written request for a hearing

on September 30, 2010 (Docket No. 6, pp. 107-08 of 715).

On September 16, 2011, Plaintiff appeared with counsel for a hearing before Administrative

Law Judge Melissa Warner ("ALJ Warner") (Docket No. 6, pp. 36-74 of 715). Also appearing at the

hearing was an impartial Vocational Expert ("VE") (Docket No. 6, p. 63 of 715). ALJ Warner found

Plaintiff to have a severe combination of lumbar spondylosis with radiculopathy at L5, major

depressive disorder, and generalized anxiety disorder, with an onset date of February 13, 2008 (Docket

No. 6, p. 19 of 715).

Despite these limitations, ALJ Warner determined, based on all the evidence presented, that

Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the

alleged onset date through the date of her decision (Docket No. 6, p. 28 of 715). ALJ Warner found

Plaintiff had the residual functional capacity to perform light work with the following exceptions:

1. Work must be performed in the seated or standing position
2. Occasionally climb stairs
3. Never climb ladders or the like
4. Never balance on one leg
5. Occasionally stoop greater than ninety degrees
6. Occasionally kneel, crouch, or crawl

      7.      Never reach greater than shoulder height
      8.      Occasionally be exposed to respiratory irritants
      9.      Never be exposed to obvious hazards
      10.     Work at an SVP of one to two where the pace of productivity is not dictated by an external source over which the individual has no control, such as an assembly line or conveyor belt
      11.     No contact with the general public
      12.     Rare contact with co-workers, rare being defined as less than occasionally but not completely precluded

(Docket No. 6, p. 22 of 715). Additionally, ALJ Warner found Plaintiff unable to perform any past

relevant work, but able to perform other work in the economy (Docket No. 6, p. 27 of 715). Plaintiff's

request for benefits was therefore denied (Docket No. 6, pp. 28-29 of 715).

On January 30, 2012, Plaintiff filed a Complaint in the Northern District of Ohio, Western

Division, seeking judicial review of her denial of DIB and SSI (Docket No. 1). In her pleading,

Plaintiff alleged the ALJ erred by: (1) failing to determine that a listed impairment applied; and (2) not

giving adequate consideration to Plaintiff's subjective allegations (Docket No. 10). Defendant filed its

Answer on April 2, 2012 (Docket No. 5).

## III. FACTUAL BACKGROUND

### A. THE ADMINISTRATIVE HEARING

An administrative hearing convened on September 16, 2011, in Toledo Ohio (Docket No. 6, p.

36 of 715). Plaintiff, represented by counsel Vernos J.Williams, appeared and testified (Docket No. 6,

pp. 39-63 of 715). Also present (via telephone) and testifying was VE Jacquelyn Schabacker ("Ms.

Schabacker") (Docket No. 6, pp. 63-74 of 715).

### 1. PLAINTIFF'S TESTIMONY

At the time of the hearing, Plaintiff was a forty-two year old single female with a high school

education (Docket No. 6, pp. 41-43 of 715). Plaintiff is the primary care giver for her three children,

ages thirteen, fifteen, and seventeen  (Docket No. 6, p. 42 of 715). Plaintiff stated she had a current and valid driver's license and had no difficulties driving (Docket No. 6, p. 42 of 715). Prior to her disability, Plaintiff worked on the line at First Solar (Docket No. 6, pp. 43, 65 of 715). According to Plaintiff, she did a variety of work while on the lines, including loading glass panels onto the belt, lamination, and employee training (Docket No. 6, pp. 65-68 of 715). Plaintiff testified that her work sometimes required her to engage in lifting weight ranging from ten to forty pounds while standing (Docket No. 6, pp. 65-66 of 715). Plaintiff stopped working at First Solar in February 2008, following a work-related incident, but continued to collect worker's compensation through July 2009[2] (Docket No. 6, pp. 43-44 of 715).

Plaintiff testified that she was currently unable to work because of the amount of medication she was on and the side effects from those medications (Docket No. 6, pp. 44-46 of 715). According to Plaintiff, she was prescribed Oxycodone, Amitriptyline, Doculase, Advair, ProAir, Predisone, and Albuterol (Docket No. 6, pp. 45-46 of 715). Plaintiff stated these medications make her drowsy and cause dizzy spells (Docket No. 6, pp. 44, 46-47 of 715). Plaintiff also stated that she was unable to work because of the pain in her lower back and the numbness in her left leg, which Plaintiff claimed began in 2006 (Docket No. 6, p. 47 of 715). She testified she was only able to stand still for ten to fifteen minutes without pain and could only sit for thirty minutes to an hour (Docket No. 6, p. 47 of 715). Plaintiff also reported having the beginning stages of Chronic Obstructive Pulmonary Disease ("COPD") and smoking up to two packs of cigarettes per day (Docket No. 6, pp. 47-48 of 715).

With regard to her mental health, Plaintiff stated that she works with a psychologist on her

---

[2] According to Plaintiff, she sustained an injury on the job in 2006, but was able to keep working through 2008 under employer-imposed restrictions (Docket No. 6, pp. 55-56 of 715).

anger, depression, and anxiety (Docket No. 6, p. 48 of 715). Plaintiff testified that she feels "hopeless, helpless, out of control, [and] angry" and experiences crying spells three to four times per day (Docket No. 6, p. 52 of 715). When asked by the ALJ what brought those crying spells on, Plaintiff stated "I just keep thinking about everything, how it used to be, what I can't do now, what I wish I could do, how I have no control over anything, and trying to figure out how to accept that I'm never gonna be completely better" (Docket No. 6, p. 52 of 715). Plaintiff also testified that she does not talk to anyone because she feels "like a loser" and does not want to be around people (Docket No. 6, pp. 54-55 of 715). Plaintiff stated she only gets two to three hours of sleep per night which forces her to lie down three to four times during the day for thirty minutes to an hour each time (Docket No. 6, pp. 50-51 of 715). Plaintiff stated she has difficulty concentrating and remembering (Docket No. 6, p. 60 of 715).

When asked about her physical ability, Plaintiff stated she could walk for a mile and a half with a lot of pain, and only a quarter of a mile without pain (Docket No. 6, p. 53 of 715). She testified that she could go grocery shopping and do household chores with some limitation, often having to rest and take a break (Docket No. 6, pp. 51, 60-61 of 715). She is able to attend to her own personal needs such as showering, dressing, and eating, and still attends her children's sports activities (Docket No. 6, pp. 52-53 of 715). Plaintiff also indicated she could drive for forty-five minutes without stopping (Docket No. 6, p. 62 of 715).

Plaintiff testified that she underwent surgery on her lower back in February 2008 (Docket No. 6, p. 56 of 715). According to Plaintiff, this surgery helped initially, but eventually her symptoms reappeared and progressively got worse (Docket No. 6, p. 56 of 715). When her doctor recommended a second surgery, a bone graft fusion, Plaintiff sought out a second opinion from a pain specialist (Docket No. 6, pp. 56-57 of 715). This doctor advised against additional surgery, according to

5

Plaintiff, because it would "not help alleviate [her] pain" (Docket No. 6, p. 56 of 715).

After refusing a second surgery, Plaintiff testified that she went on a variety of pain medications and eventually had a radiofrequency ablation[3] (Docket No. 6, p. 57 of 715). According to Plaintiff, the ablation helped, and her doctors have advised her that she will likely have to have an ablation done every year for pain management purposes (Docket No. 6, p. 57 of 715). Plaintiff testified that she was also undergoing physical therapy, including aquatic therapy, which "helped a lot" and relieved some of her pain (Docket No. 6, pp. 49-50 of 715).

Plaintiff testified that she could bend down and touch her knees and the floor, but would have some difficulty getting back up (Docket No. 6, p. 54 of 715). She also stated she had difficulty maneuvering stairs and reaching overhead (Docket No. 6, p. 54 of 715). Plaintiff denied having any problems using her hands (Docket No. 6, p. 54 of 715). Plaintiff testified she could lift bags of groceries and a gallon of milk, but was uncertain if she could lift a gallon of milk in each hand (Docket No. 6, pp. 53-54 of 715). Plaintiff also stated she experienced numbness in her left leg and confirmed a diagnosis of radiculopathy (Docket No. 6, p. 58 of 715).

When asked by her attorney, Plaintiff stated she remembered having a functional capacity evaluation in August 2008 after which it was recommended that Plaintiff be restricted to sedentary work (Docket No. 6, p. 58 of 715). Plaintiff, however, did not remember another evaluation in which it was recommended that she not engage in any type of work (Docket No. 6, p. 60 of 715).

**2.      VOCATIONAL EXPERT TESTIMONY**

---

[3] Radiofrequency ablation is a procedure used to reduce pain. An electrical current produced by a radio wave is used to heat up a small area of nerve tissue, thereby decreasing pain signals from the treated area.

6

Having familiarized herself with Plaintiff's file and vocational background prior to the hearing

(Docket No. 6, pp. 63-64 of 715), the VE described Plaintiff's past work as a general laborer as

unskilled and light to medium with an specific vocational preparation ("SVP") of two (Docket No. 6,

pp. 68-69 of 715). ALJ Warner then posed the following hypothetical:

> Let's assume there's a hypothetical individual vocationally situated as is our claimant. This
> individual can perform all the functions of light work except that they need work that can
> be performed in a seated or standing position; occasionally climbing of stairs; no climbing
> of ladders and the like; balancing should never be done on one leg; stooping should be
> done only occasionally, greater than 90 degrees; occasional kneeling, crouching, and
> crawling; no reaching greater than shoulder-height; occasional exposure to respiratory
> irritants; no exposure to obvious hazards; work at an SVP of 1 to 2; and that work should
> be where the pace of productivity is not dictated by an external source over which the
> individual has no control, such as an assembly line or conveyor belt; no contact with the
> general public, and rare contact with coworkers, and by rare, I mean less than occasionally
> but not completely precluded. Would such a person be able to perform the claimant's past
> relevant work?

(Docket No. 6, pp. 69-70 of 715). Taking into account these limitations, the VE testified that Plaintiff

could not return to her past work and that the given parameters limited the individual to "light

unskilled" work (Docket No. 6, p. 70 of 715). She testified there were jobs for which such a

hypothetical person would qualify, including: (1) inspection positions, under DOT 559.687-074, for

which there would be approximately 10,000 positions in the State of Ohio and 100,000 nationally; (2)

sorter positions, under DOT 569.687-022, for which there would be 9,000 in the State of Ohio and

120,000 nationally; and (3) wire worker positions, under DOT 728.684-022, for which there would be

4,000 in the State of Ohio and 120,000 nationally (Docket No. 6, pp. 70-71 of 715).

ALJ Warner then asked the VE to assume "an individual with the same limitations but changed

the exertional level to . . . sedentary, again keeping the seated and standing position, would there be

other jobs the individual could perform?" (Docket No. 6, p. 71 of 715). The VE testified that there

were positions that would fit these limitations including: (1) bench assembler, under DOT 739.687-

7

066, for which there 6,000 position in Ohio and 80,000 nationally; and (2) sorter inspection positions,

under DOT 716.687-030, for which there are 10,000 positions in Ohio and 240,000 nationally (Docket

No. 6, pp. 71-72 of 715). The VE stated that the DOT does not cover seated or standing limitations but

that, based on her knowledge and experience, these jobs could be performed within those limitations

(Docket No. 6, p. 72 of 715). The VE also testified about ordinary breaks during the course of a

workday, stating normal breaks consisted of a ten to fifteen minute break in the morning and

afternoon, and a thirty to sixty minute break for lunch (Docket No. 6, p. 72 of 715). She also stated that

the ordinary tolerance for absenteeism is no more than one time per month and that an employee would

be required to be on task ninety percent of the time, outside of break times (Docket No. 6, p. 73 of

715).

**B.    MEDICAL RECORDS**

**1.    MEDICALS**

Plaintiff's medical records regarding her low back pain date back to April 12, 2006, when she

was seen by Dr. Michael Koltz, M.D. ("Dr. Koltz") (Docket No. 6, p. 597 of 715). According to

Plaintiff, her symptoms began on April 9, 2006, when she was at work "loading plates" and suddenly

stated to a coworker that she was having pain in her back (Docket No. 6, p. 597 of 715). At the time of

this initial evaluation, Plaintiff had some moderate reproducible lumbar and paralumbar tenderness

(Docket No. 6, p. 597 of 715). Plaintiff saw Dr. Koltz again on April 19, 2006, reporting similar

symptoms (Docket No. 6, p. 594 of 715). On April 25, 2006, Plaintiff saw Dr. Stephen Bazeley, M.D.

("Dr. Bazeley") who diagnosed Plaintiff with some point tenderness over the lumbar spine and the left

sacroiliac area and recommended some work restrictions (Docket No. 6, p. 591 of 715). This diagnosis

was confirmed by Dr. James Andonian, M.D. ("Dr. Andonian") on April 28, 2006 (Docket No. 6, p.

8

588 of 715).

By May 16, 2006, Plaintiff was reporting improvement in her back due to her physical therapy sessions, but still reported discomfort and pain along with numbness and tingling in her left lower extremity (Docket No. 6, p. 585 of 715). Plaintiff also reported that she had been working without restriction since her injury (Docket No. 6, p. 585 of 715). Dr. Andonian released Plaintiff back to regular work duty (Docket No. 6, p. 585 of 715).

On July 31, 2006, Plaintiff returned to Dr. Koltz complaining of sustained lower back pain (Docket No. 6, p. 581 of 715). Dr. Koltz noted that Plaintiff appeared "quite frustrated and intolerable of everything at work" (Docket No. 6, p. 581 of 715). The doctor recommended Motrin for the pain and physical therapy (Docket No. 6, p. 581 of 715). Plaintiff began physical therapy at Glass City Injury and Rehab on December 29, 2006 (Docket No. 6, p. 626 of 715).

On April 25, 2007, Plaintiff sought a second opinion for her lower back pain from Dr. Nabil Ebraheim ("Dr. Ebraheim") (Docket No. 6, p. 344 of 715). Dr. Ebraheim noted Plaintiff had slight pain on palpation over the left side of her lower spine as well as on both sacroiliac joints, although it was more severe on the left (Docket No. 6, p. 344 of 715). Dr. Ebraheim recommended Plaintiff undergo a series of bilateral sacroiliac joint injections and return in six weeks (Docket No. 6, pp. 344, 346 of 715). Plaintiff returned to Dr. Ebraheim on June 7, 2007, and rated her pain as a level four out of a possible ten (Docket No. 6, p. 343 of 715). Dr. Ebraheim recommended Plaintiff undergo lab work and referred her to a pain management doctor for further care (Docket No. 6, p. 343 of 715).

Plaintiff returned to Dr. Ebraheim on July 25, 2007 (Docket No. 6, p. 342 of 715). At that time, Dr. Ebraheim noted that Plaintiff failed to follow through on the recommended lab work or with the pain management doctor (Docket No. 6, p. 342 of 715). Dr. Ebraheim again recommended Plaintiff

9

undergo lab work and follow up with a pain management specialist (Docket No. 6, p. 342 of 715). The doctor also noted that he would put in a C9 request for bilateral sacroiliac joint injections (Docket No. 6, p. 342 of 715). Plaintiff received these injections on September 13, 2007 (Docket No. 6, p. 341 of 715), and again on October 25, 2007 (Docket No. 6, p. 339 of 715).

On November 15, 2007, Plaintiff attended a follow-up appointment with Dr. Ebraheim (Docket No. 6, p. 338 of 715). The doctor noted that Plaintiff was not able to ambulate without assistance and was directly tender to palpation over her bilateral sacroiliac joints with a full range of motion (Docket No. 6, p. 338 of 715). Dr. Ebraheim advised Plaintiff to continue taking Motrin and attend both physical and aquatic therapy (Docket No. 6, p. 338 of 715). On December 5, 2007, Dr. Ebraheim gave Plaintiff a work release slip to return to work, restricting her activity to lifting no more than ten pounds (Docket No. 6, p. 336 of 715).

On December 10, 2007, Plaintiff re-engaged with physical therapy with Tawiona Triplett, P.T. ("Ms. Triplett") (Docket No. 6, p. 333 of 715). Ms. Triplett reported that Plaintiff rated her pain at a six out of a possible ten but that the level decreased when she took her prescribed pain medication (Docket No. 6, p. 333 of 715). Plaintiff had palpable tenderness along her lumbar paraspinals and numbness and tingling down into her left foot (Docket No. 6, p. 333 of 715). Ms. Triplett recommended dynamic lumbar stabilization exercises (Docket No. 6, p. 334 of 715).

Plaintiff returned to Dr. Ebraheim on December 31, 2007 (Docket No. 6, p. 331 of 715). Plaintiff reported her pain level at a five out of a possible ten along with numbness and tingling down into her left foot (Docket No. 6, p. 331 of 715). Dr. Ebraheim noted that Plaintiff's MRI showed no obvious abnormality in her lumbosacral spine and recommended Plaintiff undergo a sacroiliac fusion using screws to alleviate her pain (Docket No. 6, pp. 331-32 of 715). Plaintiff underwent this sacroiliac

10

joint pinning using two screws in each of her sacroiliac joints on February 13, 2008 (Docket No. 6, p. 323 of 715).

Plaintiff reported gradual improvement after her surgery, especially in conjunction with her physical therapy (Docket No. 6, pp. 319, 321 of 715). By May 22, 2008, Plaintiff described her condition as "much better than before the surgery" and rated her pain at a level four out of a possible ten (Docket No. 6, p. 315 of 715). Notes from a follow-up appointment with Dr. Ebraheim on June 19, 2008, indicate that Plaintiff was walking without a limp and had only minimal tenderness over her bilateral sacroiliac joints (Docket No. 6, p. 314 of 715). On August 14, 2008, Plaintiff underwent a physical work performance test (Docket No. 6, p. 309 of 715). According to the result, Plaintiff was capable of performing work at a sedentary level for an eight-hour day, but was restricted to lifting no more than eighteen pounds, standing no longer than one-third of the workday, and doing no work in a bent over standing position (Docket No. 6, p. 306 of 715). These restrictions were placed in Plaintiff's workers compensation file on August 28, 2008 (Docket No. 6, p. 308 of 715).

Plaintiff's progress began to diminish in October 2008 when she began to suffer from increased tenderness in her sacroiliac joints (Docket No. 6, p. 308 of 715). On October 15, 2008, Plaintiff was given cortisone injections in her lower back (Docket No. 6, p. 307 of 715). On December 29, 2008, Plaintiff received cortisone injections in her bilateral sacroiliac joints (Docket No. 6, p. 306 of 715). On January 22, 2009, Plaintiff underwent an independent medical examination by Dr. Sushil Sethi, M.D. ("Dr. Sethi") (Docket No. 6, p. 510 of 715). According to Dr. Sethi, Plaintiff had no obvious swelling, muscle deformity or spasms, or curvature of her spine (Docket No. 6, p. 512 of 715). Plaintiff had a good range of motion with a normal gait and was able to walk on both her tiptoes and heels and squat down without any ambulatory aid (Docket No. 6, p. 512 of 715). Dr. Sethi opined that Plaintiff

11

had reached a "treatment plateau" (Docket No. 6, p. 514 of 715). Plaintiff was discharged from physical therapy on January 26, 2009 (Docket No. 6, p. 348 of 715).

However, by February 9, 2009, Plaintiff was back in Dr. Ebraheim's office complaining of a "small degree of underlying sacroiliac joint pain bilaterally" with her left side being worse than her right (Docket No. 6, p. 367 of 715). Dr. Ebraheim recommended Plaintiff undergo a sacroiliac joint fusion with bone grafting (Docket No. 6, p. 367 of 715).

On February 13, 2009, Plaintiff was involved in a car accident after which she allegedly noticed a worsening of her symptoms (Docket No. 6, p. 619 of 715). Plaintiff returned to physical therapy at Glass City Injury and Rehab for four to six weeks to decrease her muscle spasms and increase her range of motion (Docket No. 6, p. 619 of 715). Her therapist reported some improvement, both subjectively and objectively, but recommended further treatment (Docket No. 6, p. 620 of 715).

By April 2009, Plaintiff was complaining of increased pain down her left leg (Docket No. 6, p. 369 of 715). On April 24, 2009, Plaintiff attended an appointment with Dr. Thomas Andreshak ("Dr. Andreshak") who diagnosed Plaintiff with possible left leg radiculopathy (Docket No. 6, p. 369 of 715). By May 19, 2009, Dr. Andreshak reported that Plaintiff showed evidence of bilateral chronic L5 radiculopathy and recommended lumbar facet injections, including median branch blocks, to try and decrease Plaintiff's pain symptoms and also to pinpoint the source of her pain (Docket No. 6, p. 368 of 715).

On July 9, 2009, Plaintiff saw Dr. Amish Patel, M.D. ("Dr. Patel") presenting with bilateral lumbar paramedian tenderness exacerbated with flexion and extension as well as posterior gluteal discomfort (Docket No. 6, p. 365 of 715). Plaintiff rated her pain at a level six out of a possible ten (Docket No. 6, p. 364 of 715). Dr. Patel's records also indicate that Plaintiff was smoking one to one

12

and a half packs of cigarettes per day (Docket No. 6, p. 364 of 715). On August 18, 2009, Dr. Patel performed a radiofrequency denervation of Plaintiff's L4 and L5 medial branches (Docket No. 6, p. 362 of 715). Immediately following the procedure Plaintiff reported her pain level at one to two out of a possible ten (Docket No. 6, p. 362 of 715). By September 24, 2009, Plaintiff had returned to Dr. Patel, rating her pain at a level six out of a possible ten (Docket No. 6, p. 358 of 715). Plaintiff also reported a lack of appetite and a decreased desire to engage in basic daily activities (Docket No. 6, p. 358 of 715). Dr. Patel recommended Plaintiff seek a psychiatric evaluation (Docket No. 6, p. 359 of 715). Dr. Patel made this same recommendation on November 19, 2009 (Docket No. 6, p. 357 of 715). Also on November 19, 2009, Plaintiff visited Dr. Ebraheim who opined that Plaintiff was an ideal candidate for an open fusion of her sacroiliac joints using a bone graft (Docket No. 6, p. 354 of 715). In the alternative, Dr. Ebraheim recommended Plaintiff try an ablation as a temporary method of controlling her pain (Docket No. 6, p. 355 of 715).

Plaintiff continued to suffer with bilateral paramedian tenderness throughout 2010 and 2011, with frequent visits to Dr. Patel (Docket No. 6, pp. 639-69 of 715). Dr. Patel repeatedly recommended additional radiofrequency denervations of her medial branches (Docket No. 6, pp. 639-69 of 715). On April 18, 2011, Plaintiff underwent that radiofrequency denervation (Docket No. 6, p. 635 of 715).

### 2. EVALUATIONS

On October 30, 2009, Plaintiff underwent an independent medical evaluation with Dr. Thomas Lieser ("Dr. Lieser") for purposes of determining whether or not Plaintiff also suffered from lumbosacral spondylosis without myelopathy at the L5-S1 vertebrae (Docket No. 6, p. 548 of 715). Dr. Lieser found no indication of this additional condition and instead found that Plaintiff had reached a level of maximum medical improvement (Docket No. 6, p. 553 of 715). Accordingly, Dr. Lieser found

13

Plaintiff was not temporarily and totally disabled (Docket No. 6, p. 553 of 715). Dr. Lieser reaffirmed this opinion and diagnosis on March 25, 2010 (Docket No. 6, pp. 532-36 of 715).

Plaintiff underwent a psychological evaluation on January 8, 2010, with clinical psychologist Dr. Diane Derr Lewis, Ph.D ("Dr. Derr Lewis") (Docket No. 6, p. 374 of 715). Plaintiff reported suffering from low self-esteem and being unhappy and feeling incompetent, useless, helpless, and angry along with impaired sleep and appetite (Docket No. 6, p. 375 of 715). Dr. Derr Lewis noted that Plaintiff was anxious and upset and her mood was depressed (Docket No. 6, p. 375 of 715). Plaintiff's clinical profile was consistent with someone who was experiencing severe emotional distress, characterized by depression and anxiety (Docket No. 6, p. 376 of 715). Therefore, Dr. Derr Lewis diagnosed Plaintiff with Major Depressive Disorder (single episode) and Anxiety Disorder NOS (Docket No. 6, p. 377 of 715). Dr. Derr Lewis opined that these psychological conditions were of sufficient severity that they prevented Plaintiff from being able to work (Docket No. 6, p. 377 of 715). Therefore, Dr. Derr Lewis found Plaintiff to be temporarily and totally disabled (Docket No. 6, p. 377 of 715).

On March 24, 2010, at the request of the Bureau of Workers' Compensation ("BWC"), Plaintiff underwent a second independent mental health evaluation with Dr. Rachel Nijakowski ("Dr. Nijakowski") (Docket No. 6, p. 528 of 715). According to Dr. Nijakowski, Plaintiff presented as a very focused individual who had never suffered with anxiety or depression in the past and who had grown angry and frustrated over her April 2006 injury (Docket No. 6, p. 530 of 715). She found Plaintiff to have difficulties with focus and concentration (Docket No. 6, p. 530 of 715). Dr. Nijakowski diagnosed Plaintiff with depressive psychosis moderate and anxiety state NOS, a direct and proximate result of Plaintiff's work-related injury of April 9, 2006, and the subsequent complications (Docket

No. 6, p. 531 of 715). The doctor found Plaintiff to be temporarily and totally disabled due to these conditions (Docket No. 6, p. 531 of 715).

On March 28, 2010, Plaintiff underwent a Mental Residual Functional Capacity Assessment (Docket No. 6, pp. 392-95 of 715). The assessment revealed that Plaintiff, for the most part, had no evidence of limitation or was not significantly limited in the categories presented (Docket No. 6, pp. 392-95 of 715). The assessment only found Plaintiff to be moderately limited in two aspects: (1) her ability to maintain attention and concentration for extended periods; and (2) her ability to respond appropriately to changes in her work setting (Docket No. 6, pp. 392-93 of 715).

Plaintiff underwent a third mental health evaluation with Dr. Michael Murphy, Ph.D ("Dr. Murphy") on March 31, 2010 (Docket No. 6, pp. 503-23 of 715). Dr. Murphy noted that Plaintiff was distracted by her pain and had impaired short-term memory and social functioning (Docket No. 6, pp. 518-19 of 715). He noted Plaintiff was not able to sustain her focus or attention long enough to permit completion of regular workplace tasks and was not able to maintain regular work attendance from a psychological standpoint (Docket No. 6, p. 520 of 715). However, Dr. Murphy was unable to establish either Major Depressive Disorder or Anxiety Disorder related to Plaintiff's 2006 workplace injury, specifically noting that many of Plaintiff's significant stressors were present both pre and post-injury (Docket No. 6, p. 522 of 715). Dr. Murphy attributed Plaintiff's anxiety disorder to her 2008 diagnosis of COPD (Docket No. 6, p. 522 of 715). Dr. Murphy also took note of Plaintiff's strong "fake bad" response to questions (Docket No. 6, p. 522 of 715). Plaintiff overly exaggerated and distorted her problems and Dr. Murphy concluded that Plaintiff's true level of problems and symptoms were likely to be less than what Plaintiff indicated (Docket No. 6, pp. 520, 522 of 715).

On April 15, 2010, Plaintiff underwent a Physical Residual Functional Capacity Assessment

15

with Dr. Eli Perencevich, D.O. ("Dr. Perencevich") (Docket No. 6, pp. 396-403 of 715). This assessment found Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk with normal breaks for a total of six hours in an eight-hour workday, sit with normal breaks for a total of about six hours in an eight-hour workday, and push and/or pull, including operation of hand and/or foot controls, an unlimited amount (Docket No. 6, p. 397 of 715). The assessment also found Plaintiff could occasionally climb ladders/ropes/scaffolds, stoop, kneel, crouch, and crawl (Docket No. 6, p. 398 of 715). Dr. Perencevich recommended that Plaintiff avoid all exposure to hazards, such as machinery and heights (Docket No. 6, p. 400 of 715).

Just over one year later, Plaintiff underwent a Physical Ability to do Work-Related Activities Assessment with Dr. Patel (Docket No. 6, pp. 686-91 of 715). Dr. Patel concluded that Plaintiff: (1) could lift/carry up to twenty pounds occasionally; (2) could sit, stand, and walk for ten minutes at a time without interruption; (3) could sit, stand, and walk for two hours in an eight-hour workday; (4) could occasionally reach overhead, never push/pull, and frequently reach, handle, finger, and feel; (5) could frequently use foot controls; (6) could occasionally climbs stairs and ramps and balance; (7) could never climb ladders or scaffolds, stoop, kneel, crouch, or crawl; and (8) could never be exposed unprotected heights, moving mechanical parts, or pulmonary irritants, but could occasionally operate a motor vehicle and be exposed to humidity/wetness, extreme heat/cold and vibrations (Docket No. 6, pp. 686-91 of 715).

On August 29, 2011, Plaintiff underwent another independent psychological evaluation with Dr. Joan Lawrence, Ph.D ("Dr. Lawrence") (Docket No. 6, pp. 698-703 of 715). Dr. Lawrence also noted Plaintiff's tendency to "fake bad," which prevented her from interpreting Plaintiff's clinical profile (Docket No. 6, pp. 701-02 of 715). However, Dr. Lawrence opined that Plaintiff's Major

16

Depressive Disorder was "massively overwhelming" to Plaintiff and was only under "fragile control" (Docket No. 6, p. 702 of 715). With regard to Plaintiff's Anxiety Disorder NOS, Dr. Lawrence reported that Plaintiff was close to maximum medical improvement but note quite there yet (Docket No. 6, p. 702 of 715). As a result of these opinions, Dr. Lawrence concluded that there was no kind of employment that Plaintiff could perform and she recommended continued cognitive behavioral psychotherapy (Docket No. 6, p. 703 of 715).

Finally, on September 9, 2011, Plaintiff underwent a Mental Ability to do Work-Related Activities assessment with Dr. David Lewandowski, M.Ed. ("Dr. Lewandowski") (Docket No. 6, p. 704-06 of 715). Dr. Lewandowski found Plaintiff had mild limitations with regard to her ability to understand and remember simple instructions, carry out simple instructions, and interact appropriately with the public (Docket No. 6, pp. 704-05 of 715). Plaintiff had moderate limitations in her ability to make judgments on simple work-related decisions and interact appropriately with coworkers (Docket No. 6, pp. 704-05 of 715). Plaintiff had marked limitations in her ability to understand and remember complex instructions, carry out complex instructions, make judgments on complex work-related decisions, and respond appropriately to usual work situations and changes in routine work settings (Docket No. 6, pp. 704-05 of 715).

### IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920.  *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007).  DIB and SSI are available only for those who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42 U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim. First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id*. (*citing Abbott,* 905 F. 2d at 923). At the third step, a claimant is presumed to be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner

18

must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform. *Colvin*, 475 F.3d at 730 (*citing Heston v. Comm'r of Soc. Sec*., 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730 (*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Warner made the following findings:

1. Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2014.

2. Plaintiff has not engaged in substantial gainful activity since February 13, 2008, the alleged onset date.

3. Plaintiff has the following severe impairments: lumbar spondylosis with radiculopathy at L5, major depressive disorder, and a generalized anxiety disorder.

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the residual functional capacity to perform light work subject to the following conditions: Plaintiff requires work that can be performed in the seated or standing position; can occasionally climb stairs; can never climb ladders or the like; can never balance on one leg; can only occasionally stoop greater than ninety degrees; can occasionally kneel, crouch, or crawl; can never reach greater than shoulder height; can occasionally be exposed to respiratory irritants; can never be exposed to obvious hazards; can work at an SVP of one or two where the pace of productivity is not dictated by an external source over which

19

the individual has no control, such as an assembly line or conveyor belt; can have no contact with the general public; and can have rare contact with coworkers.

6.    Plaintiff is unable to perform any past relevant work.

7.    Plaintiff was born on October 13, 1968, and was 39 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.

8.    Plaintiff has at least a high school education and is able to communicate in English.

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.   Considering the Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.   Plaintiff has not been under a disability, as defined in the Social Security Act, from February 13, 2008, through the date of this decision.

(Docket No. 6, pp. 17-29 of 715). ALJ Warner denied Plaintiff's request for DIB and SSI benefits (Docket No. 6, p. 29 of 715)

**VI. STANDARD OF REVIEW**

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

20

*McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

### A.   PLAINTIFF'S ALLEGATIONS

In her Brief on the Merits, Plaintiff argues the ALJ erred: (1) in the determination of whether a listed impairment should apply; and (2) by not giving adequate consideration to Plaintiff's subjective allegations. Plaintiff also alleges that her claim warrants a sentence six remand on the basis of new evidence (Docket No. 10).

### B.   DEFENDANT'S RESPONSE

Defendant contends substantial evidence exists to support the ALJ's: (1) finding at step three of the sequential evaluation process; and (2) finding that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms are not credible to the extent that they are inconsistent with her residual functional capacity assessment. Defendant argues that Plaintiff has failed to meet her burden of proof to warrant a sentence six remand (Docket No. 11).

### C.   DISCUSSION

#### 1.   ALJ'S FINDING AT STEP THREE

Plaintiff alleges that ALJ Warner erred by determining that Plaintiff's Major Depressive Disorder did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part

404, Subpart P, Appendix 1 (Docket No. 10, p. 12 of 23). Specifically, Plaintiff claims that the ALJ

erred in her assessment of § 12.04(A)(1)(B) (Docket No. 10, p. 12 of 23).[4] Defendant disagrees

(Docket No. 11, p. 10 of 18).

 As stated above, the Commissioner uses a five-step sequential evaluation process to evaluate a

DIB or SSI claim. *See* Section IV, *supra*. The third step in this sequential evaluation process requires

the Commissioner to determine whether one, or a combination of more than one, of a claimant's severe

impairments either meets or are equivalent in severity to one or more the "listed" medical conditions.

20 C.F.R. §§ 404.1520(d), 416.920(d). These "listed" medical conditions "describes for each of the

major body systems impairments that [the Social Security Administration] consider[s] to be severe

enough to prevent an individual from doing any gainful activity, regardless of . . . her age, education,

or work experience." 20 C.F.R. § 404.1525(a). Within each listing, the Social Security Administration

specifies the medical and other findings needed to satisfy the criteria of that particular listing. 20

C.F.R. § 404.1525(c)(3). A claimant's impairment meets a listed impairment only when it manifests

the specific findings described in the set of medical criteria for the particular listed impairment. 20

C.F.R. §§ 404.1525(d), 416.925(d). It is the claimant's burden to bring forth evidence to establish that

she meets or equals a listed impairment. *See Evans v. Sec'y of Health and Human Servs.*, 820 F.2d

161, 164 (6th Cir. 1981) (per curiam).

 The listed impairment upon which Plaintiff relies is found under § 12.00: Mental Disorders.

The Social Security Administration arranges mental disorders into nine diagnostic categories. Each

category consists of two sets of criteria that a claimant must satisfy in order to prove her disability: (1)

---

 [4] It should be noted that § 12.04(A)(1)(B) does not actually exist. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1. Plaintiff was likely referring to § 12.04(A).

a statement describing the disorder or disorders addressed by the listing, commonly referred to as "paragraph A" criteria; and (2) a set of impairment-related functional limitations, commonly referred to as "paragraph B" criteria. 20 C.F.R. § 404, Subpart P, Appendix 1, §12.00(A). Some of the categories, including § 12.04, also include another set of functional criteria, commonly known as "paragraph C" criteria. 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A). Paragraph A criteria "substantiate medically the presence of a particular mental disorder" using specific symptoms, signs, and laboratory findings. 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A). Paragraph B and C criteria "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

Plaintiff's claim deals specifically with a disorder listed under § 12.04: Affective Disorders (Docket No. 10, p. 12 of 23). Disorders found in this category are "characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.04. The "required level of severity for these disorders is met when the requirements in both [paragraph] A and B are satisfied, or when the requirements in [paragraph] C are satisfied." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.04. To meet the requirements of paragraph A, Plaintiff must suffer from a depressive syndrome characterized by at least four of the following requirements: (1) anhedonia or pervasive loss of interest in almost all activities; (2) appetite disturbance with change in weight; (3) sleep disturbance; (4) psychomotor agitation or retardation; (5) decreased energy; (6) feelings of guilt of worthlessness; (7) difficulty concentrating or thinking; (8) thoughts of suicide; or (9) hallucinations, delusions, or paranoid thinking. 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.04.

Plaintiff alleges that ALJ Warner failed to bring up, let alone discuss, any paragraph A criteria (Docket No. 10, p. 12 of 23). This is true: the ALJ's opinion is devoid of any mention of paragraph A

23

criteria (Docket No. 6, pp. 20-22 of 715). However, as Defendant argues, ALJ Warner conclusively found, based on the submitted medical evidence, that Plaintiff suffers from a major depressive disorder (Docket No. 11, p. 10 of 18; No. 6, pp. 19-20 of 715). In fact, the record is replete with both Plaintiff's complaints of and medical findings confirming this diagnosis (Docket No. 6, pp. 530-31, 519-23, 702 of 715). Since ALJ Warner did not question the existence of medical evidence establishing the persistence of Plaintiff's depressive syndrome, as required by paragraph A criteria, there was no need to go into any detail on this point.

To meet the requirements of paragraph B, Plaintiff's medically documented depressive syndrome must result in at least two of the following: (1) marked restriction of activities of daily living;[5] (2) marked difficulties in maintaining social functioning;[6] (3) marked difficulties in maintaining concentration, persistence, or pace;[7] or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.04(B). Under the listing, marked "means more than moderate but less than extreme." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(C). Episodes of decompensation are "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20

---

[5] Activities of daily living include activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for grooming and hygiene, using telephones and directories, and using a post office. 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(C)(1).

[6] Social functioning includes the ability to get along with others such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(C)(2).

[7] Concentration, persistence, or pace refers to the "ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(C)(3).

C.F.R. § 404, Subpart P, Appendix 1, § 12.00(C)(4).

Plaintiff alleges that ALJ Warner failed to include any discussion of the medical evidence that led her to find that Plaintiff did not meet the paragraph B criteria (Docket No. 10, p. 15-16 of 23). Defendant disputes this allegation, arguing that the ALJ considered the paragraph B criteria in great detail (Docket No. 11, p. 11 of 18). This Magistrate agrees.

First, ALJ Warner found that Plaintiff had no limitation in daily activities (Docket No. 6, p. 21 of 175). By her own admission, Plaintiff has no difficulties with her personal care; her depression has not affected her ability to dress or bathe herself, care for her hair, shave, feed herself, or use the bathroom (Docket No. 6, p. 202 of 715). Plaintiff indicated she does not need any special reminders to take care of her personal needs and grooming, nor does she need help or reminders to take her medications (Docket No. 6, p. 202 of 715). In her evaluation with Dr. Murphy, Plaintiff indicated she did light housework and laundry, took care of the cat, prepared meals on occasion, and cared for her children (Docket No. 6, p. 519 of 715). Although ALJ Warner did not go into extreme detail as to Plaintiff's abilities to engage in activities of daily living, her decision on this point is clearly supported by substantial evidence.

Second, ALJ Warner found Plaintiff had only a "moderate" limitation in social functioning (Docket No. 6, p. 21 of 715). In her Adult Function Report, Plaintiff indicated that she frequently spends time with others, engaging in activities such as movies, watching television, and playing board games (Docket No. 6, p. 204 of 715). Plaintiff also reported that she would go to dinner with her parents and attend her children's ball games (Docket No. 6, p. 257 of 715). In Plaintiff's Mental Residual Functional Capacity Assessment, the examiner found no evidence of limitation with regards to Plaintiff's social interaction (Docket No. 6, p. 393 of 715). However, Plaintiff also indicated that she

25

does not want to be around people and finds herself becoming more withdrawn from her family and social contacts (Docket No. 6, pp. 55, 519, 530 of 715). Upon reviewing the evidence, it is clear that Plaintiff suffers from some level of difficulty in maintaining normal social functioning; however, as demonstrated by the evidence, these troubles do not rise to the level of "marked difficulty." Plaintiff is still able to engage with others and in social situations. Therefore, the ALJ was correct in finding that Plaintiff had only a moderate limitation in social functioning.

With regard to concentration, persistence, or pace, ALJ Warner determined Plaintiff had only a "moderate" limitation (Docket No. 6, p. 21 of 715). In her Adult Function Report, Plaintiff indicated that she can pay attention for thirty minutes to an hour, finishes what she starts, and is "pretty good" at following both written and spoken instructions (Docket No. 6, pp. 205, 230 of 715). However, both Dr. Murphy and Dr. Lawrence found Plaintiff to suffer from some difficulty with concentration, persistence and pace (Docket No. 6, pp. 520, 702 of 715). In Plaintiff's Mental Residual Functional Capacity Assessment, Plaintiff was found to have moderate limitations in her ability to maintain attention and concentration for extended periods (Docket No. 6, p. 392 of 715). However, Plaintiff was found to have no limitation with a vast majority of the mental activities associated with sustained concentration and persistence (Docket No. 6, p. 392-93 of 715). Upon reviewing the evidence, it is clear that Plaintiff suffers from some level of difficulty in maintaining normal concentration, persistence, and pace; however, as demonstrated by the evidence, this difficulty does not rise to the level of "marked difficulty." Therefore, the ALJ was correct in finding that Plaintiff had only a moderate limitation in concentration, persistence and pace.

Finally, ALJ Warner concluded that Plaintiff had never experienced episodes of decompensation (Docket No. 6, p. 21 of 715). This is correct: there is no evidence in the record to

indicate that Plaintiff has ever experienced *any* episode of decompensation as defined under 20 C.F.R.

§ 404, subpart P, Appendix 1, § 12.00(C)(4). Upon review of the evidence, this Magistrate finds that

Plaintiff's mental impairments do not cause at least two "marked" limitations or one "marked"

limitation and "repeated" episodes of decompensation. Therefore, the ALJ's determination that the

paragraph B criteria were not met is supported by substantial evidence and is affirmed.

### 2.    PLAINTIFF'S SUBJECTIVE STATEMENTS

Plaintiff alleges that the ALJ erred by not giving adequate consideration to her subjective

allegations (Docket No. 10, p. 16 of 23). Specifically, the ALJ found that Plaintiff's "medically

determinable impairments could reasonably be expected to cause some of the alleged symptoms;

however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these

symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity"

(Docket No. 6, p. 26 of 715).

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.

*Siterlet v. Sec'y of Health and Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987) (per curiam). An ALJ

need not fully credit subjective complaints where there is no underlying medical basis. *Fraley v. Sec'y

of Health and Human Servs.*, 733 F.2d 437, 440 (6th Cir. 1984). The Social Security Administration

provides guidelines as to how an ALJ should evaluate a claimant's symptoms, including pain. Under

20 C.F.R. § 404.1529(a), the Social Security Administration considers:

> all your symptoms, including pain, and the extent to which your symptoms can reasonably
> be accepted as consistent with the objective medical evidence and other evidence . . . We
> will consider all of your statements about your symptoms, such as pain, and any description
> you, your treating source or nontreating source, or other persons may provide about how
> the symptoms affect your activities of daily living and your ability to work. However,
> statements about your pain or other symptoms will not alone establish that you are
> disabled; there must be medical signs and laboratory findings which show that you have
> a medical impairment(s) which could reasonably be expected to produce the pain or other

symptoms alleged and which, when considered with all of the other evidence . . . would
lead to a conclusion that you are disabled.

20 C.F.R. § 404.1529(a). Where a claimant's subjective allegations suggest more severe symptoms

than would reasonably be expected to be produced by the benign and questionable medical findings, it

is the ALJ who is responsible for making credibility determinations. 20 C.F.R. §§ 404.1529(c)(1)-(4),

416.929(c)(1)-(4).

ALJ Warner opined, through numerous detailed examples, that the record as a whole did not

support Plaintiff's allegations of disabling limitations (Docket No. 6, pp. 22-27 of 715). Plaintiff, in

her Adult Disability Report, alleged disability due to mental problems and a back injury (Docket No.

6, p. 191 of 715). She reported that these impairments limited her ability to work because she can not

stand for more than five minutes at a time, she cannot keep things straight in her mind, she does not

want to be around people, and she is often distraught, distant, and easy to anger (Docket No. 6, pp.

258-59 of 715). During her testimony, Plaintiff stated that she cannot sit or stand for more than fifteen

minutes at a time without pain, that her depression gives her frequent crying spells, and that she has a

hard time getting along with people (Docket No. 6, pp. 47, 52, 54-55 of 715).

There is no doubt that Plaintiff suffers from lower back issues and some form of depressive

disorder. However, as ALJ Warner pointed out, Plaintiff's statements concerning the intensity,

persistence and limiting effects of her symptoms are simply inconsistent with the objective medical

evidence and the reality of Plaintiff's situation (Docket No. 6, p. 26 of 715). For example, Plaintiff

claims that she cannot sit for more than one hour or stand for more than five minutes at a time due to

her April 9, 2006, lower back injury (Docket No. 6, p. 258 of 715). However, Plaintiff continued

working for almost two years after this injury at the same job without any difficulty (Docket No. 6, p.

43 of 715). In fact, it was Plaintiff who asked to be reinstated without any work restriction (Docket No.

28

584 of 715). Furthermore, the state evaluator and Plaintiff's own treating physician, Dr. Patel,

concluded that Plaintiff could: (1) occasionally lift and carry up to twenty pounds; and (2) frequently

reach, handle, finger, and feel (Docket No. 6, pp. 397-99, 686-88 of 715). Even Dr. Patel admitted that

Plaintiff could sit, stand, and walk for two hours in an eight-hour day (Docket No. 6, p. 687 of 715).

Furthermore, Plaintiff repeatedly responded well to physical therapy and pain management procedures

(Docket No. 6, pp. 310, 343, 349, 355, 614 of 715).

 With regard to her mental health issues, a majority of Plaintiff's numerous psychological

evaluations suggest her depression and anxiety render Plaintiff totally disabled (Docket No. 6, pp. 374-

77, 528-31, 693-95, 698-703 of 715). However, review of these psychological evaluations reveals that

Plaintiff was seen by these doctors for the sole purpose of undergoing an independent medical

evaluation (Docket No. 6, pp. 374, 528, 698 of 715). The opinion of a doctor who is not one of the

claimant's treating physicians and who testified to his opinion after a review of the record, rather than

after a course of treating the claimant, is entitled to less weight than reports of doctors who examined

and treated the claimant for a period of time. *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d

803, 805 (6th Cir. 1985) (per curiam). Furthermore, an examining psychologist's conclusion that the

claimant is not capable of engaging in any substantial gainful activity is a legal conclusion which is not

binding on an ALJ. *Crisp v. Sec'y of Health and Human Servs.*, 790 F.2d 450, 452 (6th Cir. 1986) (per

curiam). Therefore, ALJ Warner was not required to accept as true the opinions of Plaintiff's

consulting mental health professionals, especially when these opinions do not support the underlying

medical record. Plaintiff herself reported improvement with consistent psychotherapy (Docket No. 6,

p. 671 of 715). Plaintiff also admitted that she sometimes forgets to take her medication and that she

generally does not like taking pills (Docket No. 6, pp. 219, 263, 373 of 715). Plaintiff's Mental

29

Residual Functional Capacity Assessment found no marked limitation in Plaintiff's understanding and memory, sustained concentration and persistence, social interaction, or adaptation response (Docket No. 6, pp. 392-95 of 715). Additionally, both Dr. Murphy *and* Dr. Lawrence found Plaintiff had a tendency to "fake bad" in her responses, which limits the true validity of any psychological testing (Docket No. 6, pp. 520, 701-02 of 715).

Based on a thorough examination of the record, the Magistrate finds that Plaintiff's subjective allegations with regard to both her lower back and mental health issues are not supported by substantial evidence. Therefore, the ALJ's opinion is affirmed.

### 3.  SENTENCE SIX REMAND

Finally, in the alternative, Plaintiff requests this case be remanded on the basis of new evidence (Docket No. 10, p. 21 of 23). Section 405(g) authorizes two types of remand: (1) a post judgment remand in conjunction with a decision affirming, modifying, or reversing the decision of the Commissioner (a sentence four remand); and (2) a pre-judgment remand for consideration of new and material evidence that for good cause was not previously presented to the Commissioner (a sentence six remand). *Fauchner v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994). Under sentence six,

> [t]he court may, on motion of the Commissioner of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and it may at any time order additional evidence to be taken before the Commissioner of Social Security, *but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding*, and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the

30

Commissioner's action in modifying or affirming was based

42 U.S.C. § 405(g) (emphasis added). In a sentence six remand, the court does not rule in any way on the correctness of the administrative decision, neither affirming, modifying, or reversing the decision of the Commissioner. *See Melkonyan v. Sullivan*, 501 U.S. 89, 99-100 (1991). Rather, the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative hearing and the evidence might have changed the outcome of that hearing. *Id*. at 98.

For the purposes of a sentence six remand, evidence is only new if it "was not in existence or available to the claimant at the time of the administrative proceedings." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (*citing Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)). Here, most, *but not all*, of Plaintiff's proffered new evidence was not in existence at the time of the administrative hearing, as the medical appointments took place after September 16, 2011 (Docket No. 10, Attachments 1-5).

Newly proffered evidence is "material" only if "there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Foster*, 279 F.3d at 357 (*citing Sizemore v. Sec'y of Health and Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988)) (internal citations omitted). Of the records that could be considered "new," none of them deal with Plaintiff's lower back issue; rather, they focus on Plaintiff's apparently newly developed carpal tunnel syndrome (Docket No. 10, Attachments 1, 4). With regard to Plaintiff's depression, although there are records of an additional Mental Ability to Work Assessment in which Dr. Lewandowski finds Plaintiff's limitations to be more severe (Docket No. 10, Attachment 2), there are also psychotherapy treatment records from Dr. Glenn Swimmer, Ph.D ("Dr. Swimmer") in which it is reported that Plaintiff is more calm and is responding positively to her medication (Docket No. 10, Attachment 3). Therefore, it is unlikely that evaluation of these additional records would have changed

31

the ALJ's opinion.

A claimant shows "good cause" by "demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ. *Foster*, 279 F.3d at 357 (*citing Willis v. Sec'y of Health and Human Servs.*, 727 F.2d 551, 554 (1984) (per curiam)). Here, Plaintiff simply states that there is good cause because the "medical records were not made available until after the hearing" (Docket No. 10, p. 21 of 23). That may be true, but Plaintiff still fails to satisfy the materiality requirement. Therefore, Plaintiff's request for a sentence six remand based on new evidence is denied.

### VIII. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is affirmed.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   November 14, 2012

32